[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 6, 2010
JOHN LEY
CLERK

No. 09-10352
Non-Argument Calendar

_____

D. C. Docket No. 07-00114-CR-3-BBM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUVENAL OROZCO-PICAZO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 6, 2010)

Before HULL, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

After pleading guilty, Juvenal Orozco-Picazo appeals his convictions and

sentences for conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). After review, we affirm in part and dismiss in part.

## I. BACKGROUND

### A.    Indictment

A grand jury indicted Orozco-Picazo (along with several co-defendants) with (1) conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, ("Count One"); (2) attempt to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, ("Count Two"); (3) possession with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1), ("Count Three"); and (4) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), ("Count Four"). The charges arose out of an undercover operation in which a confidential informant ("CI"), working with a drug task force, arranged to purchase five kilograms of cocaine. Defendant Orozco-Picaso drove his brother to the prearranged meeting location with the cocaine in a bag in the trunk of the car.

The defendants, including Orozco-Picazo, initially pled not guilty and filed various pre-trial motions to suppress. In particular, Defendant Orozco-Picazo

2

moved to suppress his statement to officers after he was detained.

**B.    Suppression Hearing**

At an evidentiary hearing before a magistrate judge, task force officers testified about the undercover "buy/bust" operation. Their CI arranged to buy ten kilograms of cocaine for $19,250 per kilogram from co-defendant Cecil Young on February 22, 2007 at a residence on 7421 Penland Drive in Riverdale, Georgia. Officers set up surveillance around the residence. The CI was equipped with a monitoring device so that officers could hear and record the transaction.

The CI went into the residence and met with co-defendants Young and Wayne Taylor. Young said that five kilograms were being brought to the house and that the other five kilograms would be brought later. Taylor made a telephone call to the cocaine supplier he called "Poppy" and then reported to the CI that the supplier was on the way. While they waited, Young made another telephone call to "Poppy" and reported that the cocaine supplier was five or ten minutes away. The CI then called an undercover officer posing as the potential buyer and relayed that information to him. Young made a third telephone call to "Poppy" and said "Oh, you're outside." A few seconds later, surveillance officers observed a gold Impala pull into the driveway of the residence.

Defendant Orozco-Picazo was driving the Impala, and co-defendant David

3

Castro-Romero was a passenger. They got out of the car. Orozco-Picazo took a large white bag from the trunk of the car and walked toward the door of the residence. While Taylor waited in the TV room with the CI, Young went to the door. Young brought Defendant Orozco-Picazo and Castro-Romero into the house and introduced them to the CI. At this point, co-defendant Castro-Romero was carrying the bag. With all four co-defendants in the room, Young took the bag from Castro-Romero and emptied the contents onto a coffee table, revealing packages of cocaine. Officers overheard Taylor state that "they have good stuff, open it up, take a look." The CI asked for a knife and cut into one of the packages to make sure it was cocaine. The CI then said he would be back shortly with the money and left.

Afterward, officers obtained a search warrant for the residence. When the warrant was executed, officers found all four co-defendants, including Defendant Orozco-Picazo, in the room with the cocaine. Officers found a loaded nine millimeter handgun in Orozco-Picazo's waist area. They also found on Orozco-Picazo approximately $1,673 in U.S. currency. After Miranda warnings were given, the men gave statements to the officers. A Spanish-speaking officer, Agent Eric Arroyo, gave Orozco-Picazo his Miranda warning in Spanish and translated while Orozco-Picazo was interviewed.

4

The magistrate judge entered a report ("R&R") recommending, inter alia, denial of Defendant Orozco-Picazo's motion to suppress. After reviewing the hearing transcript, the district court overruled Orozco-Picazo's objections to the R&R and denied his motion to suppress.

## C.    Plea Agreement

A few days prior to trial, Orozco-Picazo entered into a written plea agreement to plead guilty to Counts One (cocaine conspiracy) and Four (firearm). The plea agreement stated that, as to Count One, Orozco-Picazo admitted that: (1) there was an agreement between two or more persons to distribute cocaine and (2) he became a member of that conspiracy knowing of its object and intending to help accomplish it. As to Count Four, Orozco-Picazo admitted that: (1) he committed the drug trafficking offense as charged in Count One, (2) during the commission of that offense, he possessed a firearm, and (3) he "possessed the firearm in furtherance of the drug trafficking offense." Orozco-Picazo admitted that he was pleading guilty because he was in fact guilty of Counts One and Four and that the conspiracy involved 6.95 kilograms of cocaine, which was reasonably foreseeable to him.

The plea agreement also contained an appeal waiver which stated:

> To the maximum extent permitted by federal law, the defendant voluntarily and expressly waives the right to appeal the conviction and

5

sentence and the right to collaterally attack his conviction and sentence in any post-conviction proceeding, including a § 2255 proceeding, on any ground, except that the defendant may file a direct appeal of a sentence higher than the otherwise applicable advisory sentencing guideline range. The defendant understands that this Plea Agreement does not limit the Government's right to appeal, but if the Government appeals the sentence imposed, the defendant may also file a direct appeal of his sentence.

Orozco-Picazo signed the plea agreement, certifying that he had read, understood and discussed the agreement with his attorney. By signing, Orozco-Picazo acknowledged that he understood the charges and the elements that the government would have to prove to convict him at trial.

## D. Plea Hearing

At the plea hearing, the district court, through an interpreter, conducted a plea colloquy pursuant to Federal Rule of Criminal Procedure 11. Defendant Orozco-Picazo acknowledged that he reviewed the plea agreement with his attorney, understood the agreement and signed it. The court advised Orozoco-Picazo of the rights he was giving up by pleading guilty, and Orozco-Picazo stated that he understood. After the government reviewed the contents of the plea agreement, Orozco-Picazo agreed that the government's description was consistent with his understanding of the agreement, including the 6.96 kilograms of cocaine involved in the offenses. Orozco-Picazo acknowledged that nobody threatened him to plead guilty. The government then stated the elements of the offenses in

Counts One and Four.

The government made the following factual proffer of what it would have

proved at trial:

. . . On February 22nd, 2007, Cecil Young arranged to meet a confidential informant at co-defendant Wayne Taylor's residence located at 7421 Penland (phonetic) Drive in Clayton County, Georgia. The purpose of this meeting was for Young to sell five kilograms of cocaine to the informant at $19,250 per kilogram. In the days just prior to this meeting, Young contacted co-defendant David Castro Romero [Defendant Orozco-Picazo's brother] and arranged for him to deliver the actual cocaine. Young met Castro Romero and Juvenal Orozco-Picazo when Young accompanied Taylor to a gas station in early February. At that time Orozco accompanied Castro Romero to pick up money for marijuana Castro Romero previously sold to Taylor.

On February 22nd, 2007, Young, Taylor and the informant met at the residence and waited for the cocaine to be delivered. While they were waiting, Young observed a gold Impala pull into the driveway of the residence. Orozco-Picazo was the driver. Orozco-Picazo and Castro Romero were then observed getting out [of] the vehicle and walking into the carport area. A short time later Orozco-Picazo, who was armed with a handgun, was observed going over to the car. He opened the trunk and pulled out a large white bag which he carried into the house. The informant verified that the bag carried by Orozco-Picazo contained seven bricks of cocaine. The informant advised that he needed to leave so he could get the money to pay Young and Castro Romero for the drugs.

After the informant left the residence, officers obtained a search warrant. Upon entering the residence, officers found Orozco-Picazo sitting on the sofa. The white bag with the cocaine was located on the floor between Orozco-Picazo and co-defendant Taylor. Upon searching the bag, officers recovered seven packages of cocaine which all together weighed approximately seven kilograms. When the officers conducted a search incident to arrest, they found a Beretta nine millimeter caliber handgun bearing serial number BER265640

7

> concealed under - - underneath Orozco-Picazo's shirt and tucked in the waistband of his pants. Defendant was Mirandized a short time later and he agreed to speak. He advised that a person named Mario paid him $2,000 to deliver the white bag to the Penland Drive address. The drugs were submitted to G.B.I.'s Division of Forensic Sciences for analysis. The substance tested positive for cocaine and weighed approximately 6.975 kilograms.

The district court asked Orozco-Picazo if the government correctly described what happened, to which Orozco-Picazo responded, "No." Upon inquiry, Orozco-Picazo stated that no one had paid him money to deliver the white bag to the residence and that he was merely his brother's (Castro-Romero's) driver. Orozco-Picazo said that after his detention he told Agent Arroyo the bag belonged to Mario because Agent Arroyo told him that if he did not say whose it was "they would give [him] 40 years of jail." Orozco-Picazo stated that he and his brother went to a store where his brother talked to a man named Mario. Orozco-Picazo claimed that he was scared, so he "spoke up, it was Mario's."

Orozco-Picazo stated that he did not know drugs were in the bag, which he described as a bag of dog food, until they were in the house. Orozco-Picazo admitted that, after he realized drugs were inside the bag, he stayed in the house with his brother while they waited for someone to return with money. Orozco-Picazo said that he did not know everything that was going on during the transaction because he does not speak English.

8

Orozco-Picazo admitted that during these events, he had a gun tucked in his waistband. At this point, the district court stated, "You're pleading guilty to possession of a firearm in furtherance of a drug trafficking crime. And in order to be guilty of that crime you would have to be guilty of the drug crime, which I think there's a factual basis for, and then you have to have a firearm basically to protect you in the carrying out of that drug crime. So do you understand the elements of that crime?" Orozco-Picazo replied, "Yes, but the weapon really didn't have anything to do with the drugs. My brother didn't even know that I had that."

The district court then advised Orozco-Picazo that he was here to plead guilty to the firearm offense and that he needed to tell the court if he was not guilty. The district court explained to Orozco-Picazo that the government's "theory is that this was a valuable package that [he] had, the six, almost seven kilos of cocaine, [he] had a gun, and if somebody had threatened [him] to try to take the drugs or the money, that [he] could have used the firearm to protect [him]self against those people." Orozco-Picazo said that he had the firearm with him because his cousin who was returning to Mexico had given it to him and he planned to try to sell it.

The district court stated, "[Y]ou told me you wanted to plead guilty to these crimes. I'm here to take your guilty plea. If you're telling me now that you don't

9

want to plead guilty, we'll just end this and we'll get a jury and we'll come in and try the case. It's up to you." Orozco-Picazo responded, "Well, I'm pleading guilty that I had the weapon. I'm pleading guilty because I stayed there when I found out there were drugs, but I never spoke to anybody about the drugs and I never had any deals with anybody about drugs."

The district court then asked if Orozco-Picazo understood that the firearm charge was important because it added at least five years to his sentence, and Orozco-Picazo replied, "Yes, I know." The district court explained that to be guilty of the firearm charge, Orozco-Picazo "had to be in possession of the firearm in furtherance of the drug transaction that was going on that day." The following exchange then took place in which the district court outlined the elements of the crime, including that Orozco-Picazo possessed the firearm to further the drug conspiracy and Orozco-Picazo ultimately said he was guilty of the crime:

> [The Court]: Okay. I have to establish a factual basis for you to plead guilty to this crime, and I'm not hearing you tell me that there's a factual basis for it, so let me ask you one more time. In order for you to be guilty of possession of a firearm in furtherance of a drug crime you would have had to ha[ve] possession of the firearm in some way to further the drug crime. So my question to you is did you do that?
> [Orozco-Picazo]: Well, I had the weapon with me. I never denied that. I told my lawyer that I had the weapon with me, but my brother didn't even know that I had it.
> [The Court]: You know, we keep going around about this. That's not sufficient, so I'm about to conclude the hearing unless you want to talk to him.

10

Okay, there's got to be the element of he possessed it in furtherance of the drug crime. I mean, if he didn't, fine. We'll go to trial.

[Defense Counsel]: Thank you, judge. Sorry about that.

[The Court]: All right. The best way I know to do this is explain to you what the elements are and then ask you if you understand and then ask you if you're guilty of that crime. And the elements are that you possessed the firearm to further the conspiracy, the drug crime that was going on there that day, while you were waiting for the drug dealer, the drug person to come back with the money. Do you understand the elements of the crime?

[Orozco-Picazo]: Yes.

[The Court]: Are you guilty of that crime?

[Orozco-Picazo]: Yes.

[The Court]: Okay. Is that sufficient for your purposes, Ms. King [the government]?

[Government]: Yes, Your Honor.

[The Court]: Okay. Ms. David-Vega [defense counsel], I'm sure you've gone over the evidence in this case with your client, have you?

[Defense Counsel]: Yes, I have, Judge.

[The Court]: Okay. And is he pleading guilty, to your knowledge, because of any illegally obtained evidence in the possession of the government?

[Defense Counsel]: No, Judge.

[The Court]: I find there is a factual basis for Mr. Orozco-Picazo to plead guilty to these charges.

The district court advised Orozco-Picazo of the consequences of pleading guilty, including the maximum statutory imprisonment terms on each count, the ten-year minimum imprisonment term on Count One and the five-year mandatory, consecutive term on Count Four. Orozco-Picazo responded that he understood and did not have any questions. The district court reviewed the plea agreement's appeal waiver provision and confirmed that Orozco-Picazo understood it. Orozco-

11

Picazo also stated that he was satisfied with his attorney's representation. The district court then accepted Orozco-Picazo's guilty plea and adjudicated him guilty.

## E.    Presentence Investigation Report and Sentencing

The Presentence Investigation Report ("PSI") outlined the offense conduct as follows. Beginning in late 2006, an Atlanta High Intensity Drug Trafficking Task Force began investigating a cocaine supplier, co-defendant Cecil Young, using a CI, physical surveillance and undercover operations. In January 2007, the CI made monitored and recorded telephone calls to a "contact person" to arrange a three-kilogram cocaine purchase from his supplier (Young). Although the first attempts to complete a transaction failed, the "contact person" introduced the CI to Young and co-defendant Taylor. The CI told Young that when his intended buyers returned to Atlanta, he would arrange to complete the transaction.

In late January, the CI made monitored and recorded telephone calls to Young to arrange the purchase of five kilograms of cocaine for $19,250. On January 30, 2007, the CI met Young and Taylor at a truck stop and followed Taylor to a residence at 7421 Penland Drive in Riverdale, Georgia, where they discussed a possible future purchase. After several monitored and recorded calls and meetings, on February 20, 2007, the parties agreed the five kilogram purchase would take place at the Penland Drive residence on February 22.

On that date, the task force established surveillance at the Penland Drive residence. The CI met Young and Taylor at the residence. Young told the CI that the cocaine would arrive shortly and that there were no weapons in the residence. The CI told Young he wanted to see the cocaine before giving him the money. Young made a telephone call and told the CI the cocaine was on the way.

About ten minutes later, a gold Impala occupied by two men pulled into the driveway. The driver was Defendant Orozco-Picazo and the passenger was David Castro-Romero. The men exited the car and got a large bag from the car's trunk. The men carried the bag into the residence and gave it to Young, who emptied the contents on a coffee table. The CI saw seven one-kilogram packages of cocaine. The CI cut into one of the packages to ensure that it was cocaine and then left the residence ostensibly to get the money to complete the transaction.

After the CI left, he was debriefed by task force officers, who then obtained a search warrant for the Penland Drive residence. When the search warrant was executed, officers found 6.9 kilograms of cocaine, 24 grams of marijuana and a stolen nine millimeter Beretta handgun "from the person of" Defendant Orozco-Picazo.

After their arrest, co-defendants Young, Taylor, Castro-Romero and Orozco-Picazo gave statements to the arresting officers. Taylor admitted that he contacted

Castro-Romero, who said he could provide the cocaine the CI wanted and that Castro-Romero and Defendant Orozco-Picazo delivered the cocaine. Castro-Romero told officers Defendant Orozco-Picazo contacted him and told him to meet at a restaurant, where they got into the Impala and drove to the Penland Drive residence in Riverdale. Castro-Romero claimed not to know the purpose of the trip and that it was his first time at the residence. Defendant Orozco-Picazo's statement to police was not summarized in the PSI.

However, defense counsel provided to the probation officer Defendant Orozco-Picazo's statement as to the offense, and the PSI recounted it. According to Orozco-Picazo, his brother, Castro-Romero, asked for a ride because he did not have a valid driver's license. Orozco-Picazo picked up Castro-Romero at his home and drove him to a store, where Castro-Romero met with a man called Mario. While Castro-Romero and Mario met, Defendant Orozco-Picazo went into the store to buy a bottle of water and did not know that Mario had placed a bag in the car's trunk.

After they left the store, Castro-Romero directed Defendant Orozco-Picazo to the Penland Drive residence. When they arrived, Castro-Romero told Defendant Orozco-Picazo to take the bag out of the trunk, which Orozco-Picaso did and then handed the bag to Castro-Romero as they arrived at the door. Castro-Romero took

14

the bag inside. Defendant Orozco-Picazo went to use the bathroom, and when he returned, the bag was emptied. Defendant Orozco-Picazo also stated that he "happened to have the weapon with him that day because his cousin, who was travelling [sic] to Mexico, gave it to Mr. Orozco earlier that day."

The PSI assigned a base offense level of 32, pursuant to U.S.S.G. § 2D1.1(a)(3) and (c)(4), because Count One involved 6.9 kilograms of cocaine and applied a three-level reduction for acceptance of responsibility and timely notifying authorities of his intent to plead guilty, pursuant to U.S.S.G. § 3E1.1(a) and (b), resulting in a total offense level of 29. With a criminal history category of I, Orozco-Picazo's initial guideline range was 87 to 108 months' imprisonment. Because Count One involved more than 5 kilograms of cocaine, Orozco-Picazo was subject to a 10-year mandatory minimum imprisonment term, see 21 U.S.C. § 841(b)(1)(A)(ii), which became his guidelines range, pursuant to U.S.S.G. § 5G1.1(b). Count Four (the firearm offense) carried a mandatory minimum, consecutive five-year imprisonment term. See 18 U.S.C. § 924(c)(1)(A)(i), (D)(ii) (providing that the mandatory, minimum sentence shall be "in addition to the punishment for" the underlying drug trafficking crime and that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment, including any term of imprisonment imposed

15

for the . . . drug trafficking crime during which the firearm was used, carried or possessed"). Accordingly, Orozco-Picazo's advisory guidelines range was 120 months' imprisonment on Count One and a consecutive 60-month imprisonment term on Count Four.

Orozco-Picazo's written objections to the PSI contained a reiteration of Orozco-Picazo's statement provided to the probation officer. Additionally, with regard to the PSI's factual recitation, Orozco objected that he had no prior contact with Taylor and clarified that he did not hand the bag to Young, but unloaded it from the trunk. Orozco-Picazo also requested a four-level minor role reduction, arguing that he was a not a leader and did not negotiate the transaction or have contact with Taylor, but "was a mere delivery person, someone who did not have any decision making ability."

In response to Orozco-Picazo's minor-role reduction objection, the government submitted a copy of a task force agent's investigative report, dated March 23, 2007, documenting the interview with Orozco-Picazo after the arrest at the Penland Drive residence. According to the report, Orozco-Picazo was given his Miranda warning in Spanish by Agent Arroyo, and then he waived those rights and agreed to answer questions. Orozco-Picazo then told the officers that: (1) he was "contacted earlier that day by a Hispanic male named 'Mario,' who told

16

OROZCO-PICAZO to meet at a store"; (2) when he arrived at the store, "'Mario' gave OROZCO-PICAZO a package and told OROZCO-PICAZO to deliver it to Riverdale, GA"; (3) Orozco-Picazo "was going to be paid $2,000.00 for making the delivery and was given half the money in advance (OROZCO-PICAZO had $1,673.00 U.S. Currency in his possession when he was arrested)"; (4) Mario did not tell Orozco-Picazo to pick up any money after the package was delivered; (5) Mario gave Orozco-Picazo directions to the Penland Drive residence; and (6) Orozco-Picazo did not have a phone number for, or way to contact, Mario.

At sentencing, Orozco-Picazo reasserted his objection to the PSI's not giving him a minor-role reduction. The district court declined to rule on the objection because, given that Orozco-Picazo was subject to two mandatory minimum sentences, a minor-role reduction would have no effect on his sentence. After hearing from two of Orozco-Picazo's family members, the district court imposed a total 180-month sentence, the mandatory minimum 120-month sentence on Count One and the mandatory minimum 60-month sentence on Count Four to run consecutive to Count One.[1] Orozco-Picazo never filed a motion to withdraw his guilty plea in the district court, but asserts on appeal that he should be allowed to

---

[1]At the time of Orozco-Picazo's sentencing, the district court had already sentenced Orozco-Picazo's three co-defendants as follows: (1) Young received 51 months' imprisonment, (2) Taylor received 108 months' imprisonment, and (3) Castro-Romero received 121 months' imprisonment.

17

withdraw his plea.

## II. DISCUSSION

On appeal, Orozco-Picazo argues that the district court plainly erred in accepting his guilty plea because there was an insufficient factual basis for the plea, in violation of Federal Rule of Civil Procedure 11(b)(3).[2]

## A.     Standard of Review

Ordinarily, we review a district court's determination that there is a sufficient factual basis for a guilty plea for an abuse of discretion. United States v. Owen, 858 F.2d 1514, 1516 (11th Cir. 1988). However, where, as here, the defendant failed to raise a Rule 11 issue in the district court either by objecting or moving to withdraw his guilty plea, our review is for plain error. United States v. Moriarty, 429 F.3d 1012, 1018-19 (11th Cir. 2005). To establish plain error, the defendant must show (1) error (2) that is plain (3) that affects substantial rights. Id. If all three conditions are met, we may exercise our discretion to recognize the error if the error "seriously affects the fairness, integrity or public reputation judicial proceedings." Id. (quotation marks and alteration omitted). In addition, the defendant must show a reasonable probability that, but for the error, he would not have entered his guilty plea. United States v. Dominguez Benitez, 542 U.S. 74,

[2]Orozco-Picazo's challenge relies solely on Rule 11(b)(3) and does not raise a constitutional claim.

18

83, 124 S. Ct. 2333, 2340 (2004); see also United States v. Rodriguez, 398 F.3d 1291, 1299 (11th Cir. 2005) (explaining that this "affected the outcome" requirement is a way to show the third prong of the plain error test). Moreover, in evaluating whether there was error and whether it affected substantial rights, "we may consider the whole record, not just the plea colloquy." Moriarty, 429 F.3d at 1020 n.4.

**B.     Rule 11(b)(3)**

Under Rule 11(b)(3), the district court, before entering a judgment on a guilty plea, must first "determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). This requirement protects "a defendant who mistakenly believes that his conduct constitutes the criminal offense to which he is pleading." United States v. Frye, 402 F.3d 1123, 1128 (11th Cir. 2005) (quotation marks omitted). "The standard for evaluating challenges to the factual basis for a guilty plea is whether the trial court was presented with evidence from which it could reasonably find that the defendant was guilty." Id. (quotation marks omitted). "There is no requirement . . . that there be uncontroverted evidence of guilt. Instead, there must be evidence from which a court could reasonably find that the defendant was guilty – a factual basis for the plea." Owen, 858 F.2d at 1516-17.

To convict a defendant of a cocaine conspiracy under 21 U.S.C. §§ 841 and

19

846, the government must prove beyond a reasonable doubt that (1) an illegal agreement existed to possess with the intent to distribute cocaine, (2) the defendant knew of the essential objectives of the agreement, and (3) the defendant knowingly and voluntarily joined the agreement.  United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997).  Once the existence of the underlying conspiracy is proven, the defendant's knowing participation in the conspiracy can be shown by circumstantial evidence.  Id.  "[I]t is clear that one may be found guilty of participating [in] a conspiracy even though his role is minor in the overall scheme."  Id.  Moreover, while mere presence at the scene is not sufficient to support a conviction, presence is probative of whether the defendant joined the drug conspiracy.  United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002).  "[A] defendant's assent can be inferred from acts furthering the conspiracy's purpose."  United States v. Gianni, 678 F.2d 956, 959 (11th Cir. 1982).  In addition, a defendant's knowing participation in a drug deal reasonably can be inferred from the large amount of drugs involved.  See United States v. Quilca-Carpio, 118 F.3d 719, 721-22 (11th Cir. 1997) (explaining that a jury could reasonably infer from the large amount of drugs involved that a prudent drug smuggler would not entrust "valuable cargo" to a person without his knowledge).[3]

---

[3]Contrary to Orozco-Picazo's contention, the government does not need to prove that the defendant had knowledge of the particular type or quantity of drug involved, only that the defendant

20

To convict a defendant of possession of a firearm under 18 U.S.C. § 924(c), the government must prove that (1) during and in relation to a drug-related conspiracy, (2) the defendant possessed the firearm, (3) in furtherance of that conspiracy. United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004). To show that the possession was "in furtherance," the government must establish that the firearm promoted or helped the drug conspiracy, and this "nexus" can be shown "the type of the drug activity that is being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to the drugs or drug profits, and the time and circumstances under which the gun is found." United States v. Timmons, 283 F.3d 1246, 1252-53 (11th Cir. 2002) (quotation marks omitted).

Here, the district court did not plainly err in accepting Orozco-Picazo's guilty plea. The record as a whole, including the government's proffer, the suppression-hearing transcript, the PSI and the investigative report documenting Orozco-Picazo's confession, contains ample evidence from which the district court

_____

was aware that a controlled substance was involved. United States v. Mejia, 97 F.3d 1391, 1392-93 (11th Cir. 1996). Further, deliberate ignorance is the equivalent of knowledge. See United States v. Alvarez-Coria, 447 F.3d 1340, 1344 (11th Cir. 2006). Notably, Orozco-Picazo does not dispute, and never has disputed, that the charged conspiracy involved a plan to sell at least five kilograms of cocaine and that the white bag he removed from the trunk of the Impala contained almost seven kilograms of cocaine.

21

reasonably could conclude that Orozco-Picazo knowingly joined the cocaine conspiracy, possessed the firearm in furtherance of it and, thus, was in fact guilty of both offenses. Orozco-Picazo's brother, co-defendant Castro-Romero, arranged to sell co-defendant Young five kilograms of cocaine for almost $20,000 per kilogram. Defendant Orozco-Picazo drove Castro-Romero to the prearranged location, retrieved the bag containing the cocaine from the trunk, carried the bag to the residence, watched as the CI cut open one of seven packages of cocaine and confirmed that it was cocaine and then waited with his brother while the CI went to get the money to pay for the cocaine. Throughout these events, Orozco-Picazo carried a stolen, loaded handgun in the waistband of his pants. He still had the gun in his waistband when the arresting officers entered the residence and found him sitting in close proximity to the cocaine. In addition, Orozco-Picazo confessed to the arresting officers that a man named Mario paid him $2,000 to make the delivery, and indeed Orozco-Picazo had about $1600 in cash on his person when arrested. See Owen, 858 F.2d at 1517 (pointing out that the evidence providing a factual basis for guilt need not be uncontroverted and thus rejecting the defendant's argument that a government witness's credibility was in doubt). Based on these facts, a reasonable factfinder could conclude that Orozco-Picazo knew he was participating in a drug deal and that he carried the firearm in his waistband to

22

protect the drugs he was delivering.

Additionally, even assuming Orozco-Picazo could show error that was plain, Orozco-Picazo has not met his burden to show prejudice. To establish prejudice, a defendant must show a reasonable probability that, but for the error, he would not have entered a guilty plea. Dominguez Benitez, 542 U.S. at 83, 124 S. Ct. at 2340. In his opening brief, Orozco-Picazo did not claim, much less prove, that, if the district court had inquired further into the factual basis for his guilty plea, he would not have entered it.[4] Thus, even if the district court plainly erred in accepting Orozco-Picazo's guilty plea, Orozco-Picazo has not demonstrated a reasonable probability that, but for the error, he would not have pled guilty.

## C.    Appeal Waiver

Orozco-Picazo argues that the district court committed plain error in imposing consecutive sentences on Counts One and Four. However, in his plea agreement, Orozco-Picazo waived his right to appeal his sentence unless it was "higher than the otherwise applicable guideline range."

A waiver of the right to appeal that is knowing and voluntary will be

---

[4]After the government pointed out this fatal omission, Orozco-Picazo stated in one sentence in his reply brief that he would not have entered a guilty plea "had he been properly advised of the government's burden of proof by his trial counsel or the district court." However, an appellant may not raise an issue for the first time in a reply brief. United States v. Valladares, 544 F.3d 1257, 1269 n.2 (11th Cir. 2008).

enforced in most circumstances.  United States v. Bushert, 997 F.2d 1343, 1350-51

(11th Cir. 1993).[5]  To enforce the appeal waiver, the government need only

demonstrate that "either (1) the district court specifically questioned the defendant

concerning the sentence appeal waiver during the Rule 11 colloquy, or (2) it is

manifestly clear from the record that the defendant otherwise understood the full

significance of the waiver."  Id. at 1351.

Orozco-Picazo does not argue that his appeal waiver is invalid, and the

record reveals that the district court explicitly questioned Orozco-Picazo about the

appeal waiver during the plea hearing.  Further, the event that would release

Orozco-Picazo from the appeal waiver provision did not occur; that is, the district

court did not impose a sentence that was higher than that called for by the advisory

guidelines.[6]  Thus, Orozco-Picazo's appeal waiver precludes our review of his

---

[5]Whether a defendant knowingly and voluntarily waived his right to appeal is a question of law that we review de novo.  United States v. Benitez-Zapata, 131 F.3d 1444, 1446 (11th Cir. 1997).

[6]Orozco-Picazo argues that pursuant to U.S.S.G. § 2D1.1(c), based on drug quantity, his guidelines range for Count One was 87 to 108 months, which is below the 120-month sentence imposed on this count.  However, the 87-to-108-month range was not his "applicable" guidelines range.  Rather, pursuant to U.S.S.G. § 5G1.1(b), the statutory mandatory minimum ten-year (120-month) sentence became his applicable guidelines sentence as to Count One.  Likewise, for Count Four, pursuant to U.S.S.G. § 2K2.4(b), Orozco-Picazo's applicable guidelines sentence was the mandatory minimum five-year (60-month) sentence, which "shall run consecutively to any other term of imprisonment."  See U.S.S.G. § 2K2.4, cmt. n.2(A); see also U.S.S.G. § 5G1.2(a) (providing that, in cases with multiple counts, if the statute of conviction requires a consecutive term of imprisonment, the sentence is determined by the statute and imposed independently).  Thus, Orozco-Picazo's 120-month sentence on Count One and consecutive 60-month sentence on Count Four did not exceed the applicable advisory guidelines ranges for those offenses.

consecutive sentences claim.

**AFFIRMED IN PART; DISMISSED IN PART.**